# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF CALIFORNIA

FILED
08 FEB 25 PM 12: 59

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| -vs- | ) | |
| | ) | |
| BETTY J. EBY, | ) | **Case No. C-06-2844 MJJ** |
| | ) | |
| Respondent. | ) | |
| | ) | |

## RESPONDENT'S MOTION TO DISMISS ORDER FINDING RESPONDENT IN CONTEMPT

COMES NOW Betty J. Eby, Respondent *pro se*, and hereby moves this Court to Dismiss its ORDER FINDING RESPONDENT IN CONTEMPT, filed January 29, 2008.

This Court enforced an IRS administrative first party summons of Betty J. Eby ("Eby") ordering her to produce documents and provide testimony as particularized in the attachment to said summons. The Court also imposed, in its January 29th ORDER, a $500.00 per day fine for failure to comply with the Order Enforcing Summons, which could be purged upon compliance with the Court's enforcement ORDER.

Eby has fully complied with the Court's ORDER, and now moves that

not only that the Court find Eby has satisfied the ORDER of this Court; but that it purge the $500/day fine that might have accrued against her for failure to comply with said ORDER.

Eby attended the summons meeting, bringing a licensed court reporter to record the event. A complete copy of that official transcript is attached herewith as Exhibit 1 to this Motion.

Eby brought all the documents which could be deemed to fit the description of all the documents described in the attachment to the summons.

On the bottom of page 4 of the official transcript, IRS Revenue Agent Teresa Ryan asked:

> Ms. Ryan:    "...*So for – well, first of all, do you have records that you'd like to produce per year or what did you bring in today?*"

> Ms. Eby-Rose:    "*I brought in a bunch of records. I have numbered each page.*"

This exchange shows that Eby was compliant with the Court's order that she bring her records.

The transcript shows that Agents Casey and Ryan proceeded to ask that she produce specific documents. To those requests, she invoked her Fifth Amendment right. See Exhibit 1, pp. 5-6. Agent Casey made it clear that the

requested documents could be used against her:

> Ms. Ryan: *"…Okay. Well, let's get started by year, then. What do you have for 2000?"*

> Ms. Eby-Rose: *"Before I answer that question, can those records be used against me in a criminal case?"*

> Ms. Casey: *Well, I suppose they probably could, but we're not dealing with a criminal case. \* \* \* "*

> Ms. Eby-Rose: *"I brought in a bunch of records. I have numbered each page."*

This establishes that Agent Casey admitted that if she provided the records pertaining to tax year 2000 could be used against her in a criminal proceeding. Therefore, she properly invoked her Fifth Amendment right not to be a witness against herself.

Toward the bottom of page 7 on through 8, Agent Ryan made a blanket request for documents:

> Ms. Ryan: *"So for 2000, you're not going to be writing any statement of wages, statements regarding interest or dividend income, employee earning statements for the year, records of deposits to bank accounts, and any and all of the above records, documents, receipts, regarding*

> *wages, salaries, tips, fees, commissions and any other*
>
> *compensation for services, or any other income*
>
> *regarding gains from dealings on property, interest,*
>
> *rental, ground fee, and dividend income, alimony,*
>
> *annuities, income life insurance policies and endowment*
>
> *contracts, pensions, income from the discharge of*
>
> *investment, distributed shares of partnership income, or*
>
> *income, or income from estate or trusts?"*

Ms. Eby-Rose:    *"I didn't say that. It depends on the question."*

Ms. Ryan:    *"Oh, well, I asked you all those questions. So I'll go one-on-one."*

We see that Eby did not take a "blanket Fifth."

As such, the evidence, e.g., the official transcript (Exhibit 1) shows:

(1) Eby brought her records as per the ORDER of this Court;

(2) The IRS agents conducting the hearing admitted it was possible that the items of information and documents requested, could be used against her; and,

(3) Eby invoked her Fifth Amendment right to not be a witness against herself.

Insofar as Eby invoked her Fifth Amendment protective guarantees:

Eby has a right to *not* give direct testimony that could be used against her;
Eby has a right to *not* produce documents that she created, to the extent that
they might have existed, since it is merely another form of direct testimony
against herself; and finally, Eby invoked a right to *not* give testimony against
herself by authenticating third party documents, to the extent that they might
have existed.

A "Memorandum at Law in Support of Respondent's Motion to
Dismiss Order Finding Respondent in Contempt" is filed concurrently with
this motion, and is incorporated herewith. The Memorandum explains that
Eby had a legal right to invoke her Fifth Amendment guarantees, and did not
abuse those rights, as a matter of law.

WHEREFORE, Respondent prays that this Court:

(1) FIND that Betty Eby was in full compliance with the Court's ORDER
    that she comply with the IRS administrative summons requesting
    production of documents and giving testimony, as specified in the
    attachment to said summons;

(2) That, having complied with the Court's ORDER enforcing said
    summons, that the $500.00 per day fine for failure to comply with the
    Order Enforcing Summons be purged; and,

(3) That the Court's ORDER FINDING RESPONDENT IN CONTEMPT be

dismissed in its entirety.

Respectfully submitted this ___23rd___ day of February, 2008.

*Betty J. Eby*

Betty J. Eby, Respondent *pro se*
4724 Terrace Ave.
Lakeport, California 95453

# CERTIFICATE OF SERVICE

It is hereby certified by the undersigned, a person over the age of 21 and a citizen of California, that the following documents:

(1) RESPONDENT'S MOTION TO DISMISS ORDER FINDING RESPONDENT IN CONTEMPT;

(2) MEMORANDUM AT LAW IN SUPPORT OF RESPONDENT'S MOTION TO DISMISS ORDER FINDING RESPONDENT IN CONTEMPT; and,

(3) CERTIFICATE OF MAILING;

have been sent via the U.S. Postal Service, postage having been paid in full, on the 23rd day of February, 2008, to the party indicated hereinafter.

Thomas Moore, Asst. U.S. Atty.
10th Floor, Fed. Bldg.
450 Golden Gate Ave., Box 36055
San Francisco, Ca. 94102

Betty J. Eby
4724 Terrace Ave.
Lakeport, California  95453

Also sent to:

Clerk, US Dist. Ct.—N. Dist of CA.
450 Golden Gate Ave.; 16th Floor
San Francisco, CA 94102

## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| -vs- | ) |
| | ) |
| BETTY J. EBY, | ) |
| | ) **Case No. C-06-2844 MJJ** |
| Respondent. | ) |
| | ) |

## MEMORANDUM IN SUPPORT OF RESPONDENT'S MOTION TO
## DISMISS ORDER FINDING RESPONDENT IN CONTEMPT

### COMPULSORY PRODUCTION OF DOCUMENTS

The provisions of the United States Code regarding summons enforcement proceedings, 26 U.S.C., §§ 7601 through 7610, have over the last three decades been the subject of much litigation and have been construed by the Federal Courts of Appeal as well as the United States Supreme Court. In *Reisman v. Caplin*, 375 U.S. 440, 84 S.Ct. 508 (1964), the Supreme Court held that a witness or taxpayer could challenge an I.R.S. summons on any appropriate grounds and may assert as a defense to the proceedings the fact that the materials sought by the I.R.S. relate solely for use as evidence in a criminal prosecution. In *United States v. Powell*, 379 U.S. 48, 85 S.Ct. 248 (1964), the Court delineated the four requisites necessary for any summons to be enforced. In *Donaldson v. United States*, 400 U.S. 517, 91 S.Ct. 534 (1971), the Court held that an I.R.S. summons could lawfully be used for a criminal investigation provided the summons had a civil purpose. In *Couch v. United States*, 409 U.S. 322, 93 S.Ct. 611 (1973), the Court held that the Fifth Amendment to the U.S. Constitution did not protect tax records in the possession of a taxpayer's accountant. In *United States v. Bisceglia*, 420 U.S. 141, 95 S.Ct. 915 (1975), the Court allowed the issuance of a John Doe summons for the purpose of investigating a $40,000.00 deposit of $100.00 bills. In *Fisher v. United States*, 425 U.S. 391, 96 S.Ct. 1569 (1976), the Court held that the Fifth Amendment did not protect tax records in the possession of the taxpayer's attorney. This line of cases affirmatively shows that the Internal Revenue Service

has very broad summons authority and may secure virtually any record or document in the possession of a third party.

I.R.S. summonses are issued to two separate and distinct classes of persons, with one class representing third parties who have possession and custody of books and records of the taxpayers under investigation, and the other class comprising taxpayers under investigation. A summons enforcement action is utilized when compliance with the summons has not been obtained, due to the taxpayer notifying the third party not to comply, by the institution of a suit to enjoin enforcement, or by the refusal on the part of the taxpayer to comply when summons is directed to him. When the Service proceeds to enforce a summons issued to either a third party recordholder or the taxpayer himself, its burden of proof is very minimal and amounts to nothing more than proof of compliance with the requirements of *Powell*, supra; see *United States v. Will*, 671 F.2d 963 (6th Cir. 1982).

Whereas the burden of proof upon the Service is relatively light in summons enforcement actions, a taxpayer opposing enforcement of the summons has a far heavier burden to carry. Basically, a taxpayer seeking denial of enforcement of the summons has available three defenses: (a) bad faith; (b) institutional posture, and (c) the Fifth Amendment. The "bad faith" defense is based upon *Reisman v. Caplin*, supra, and *Donaldson v. United States*, supra, and involves those situations wherein the summons has been issued for the improper purpose of gathering evidence needed for a criminal prosecution after referral to the Department of Justice. The "institutional posture" defense is based upon *United States v. LaSalle National Bank*, 437 U.S. 298, 98 S.Ct. 2357 (1978), and relates to those situations when the Service has made an institutional commitment to criminally prosecute the taxpayer under investigation but desires to withhold referral to the Justice Department to allow for the gathering of additional evidence needed for a successful criminal prosecution. These two defenses are most often utilized by a taxpayer when intervening in a third party summons enforcement action or commencing an action to enjoin enforcement of the summons.

Although a taxpayer opposing enforcement of a summons issued to him may assert the defenses of "bad faith" and "institutional posture," he will most likely rely upon the third defense available to him, that of the Fifth Amendment. The summonee under investigation in this cause, is relying solely on this defense to oppose enforcement of the Service's summons which is the subject of this action. It is the Summonee's contention that the Fifth Amendment protects him from compulsory production of books and records concerning his "income" for the tax years under investigation, especially where such production would provide all the evidence needed by the Service to commence a successful criminal prosecution against him.

The history and development of the Fifth Amendment right against self-incrimination has been one of slow but sure expansion of the benefits of its protection. James Madison, the prime author of this provision in the Bill of Rights to the U.S. Constitution, sought this provision to prevent the development in our country of proceedings similar to or identical with Spanish Inquisitions or Star Chamber proceedings. A cursory examination of the *William Penn Case*, 6 How. St. Tr. 951 (1670), reveals that resort to "Spanish Inquisitions" has on many occasions been desired in order to bring about the "efficient" operation of governmental machinery; this is what Madison desired to avoid by inserting the Fifth Amendment into our Constitution. The original intent or purpose for the Fifth Amendment was to compel the government to procure independent evidence of the facts and proof of a crime other than through the mouth of the accused. Without such a requirement and with the availability of procedures such as the Inquisition or Star Chamber, the government could constantly harass law abiding citizens and might on some occasion procure, through duress and coercion, a confession. But as is well known, such "confessions" are highly suspect, hence we have the protection of the Fifth Amendment.

One of the most appropriate statements concerning the Fifth Amendment and its operation was made by U.S. Supreme Court Justice John Marshall in the case of *United States v. Aaron Burr*. Chief Justice Marshall, quoted in *Counselman v. Hitchcock*, 142 U.S. 547, 565, 12 S.Ct. 195 (1892), maintained that a witness could plead the Fifth Amendment not only in situations where his answer to a question would directly implicate him in a crime, but also in response to questions the answer to which would provide a link in the chain of evidence needed to convict the witness of a crime. Protection from compulsory testimony designed to implicate a witness in a crime has been secured through the Fifth Amendment and has been one of the most sacred principles known to American jurisprudence. This principle of the Fifth Amendment protection from compulsory testimony, absent a grant of immunity, has seen no erosion in its application since first expounded and requires but few citations to support it; see *Hale v. Henkel*, 201 U.S. 43, 26 S.Ct. 370 (1906), *Blau v. United States*, 340 U.S. 159, 71 S.Ct. 223 (1950), and *Hoffman v. United States*, 341 U.S. 479, 71 S.Ct. 814 (1951).

The question of Fifth Amendment protection for the books, records and personal documents of a witness who may be implicated in a crime was first really considered in *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524 (1886), wherein the Supreme Court expanded Fifth Amendment protection against compulsory testimony to books and records of the witness. In granting such protection, the Court held as follows:

> "And any compulsory discovery by extorting the party's oath, or compelling the production of his private books and papers, to convict him of crime, or

to forfeit his property, is contrary to the principles of a free government. It is abhorrent to the instincts of an Englishman; it is abhorrent to the instincts of an American. It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom," 116 U.S., at 631-32.

"And we are further of opinion that a compulsory production of the private books and papers of the owner of goods sought to be forfeited in such a suit is compelling him to be a witness against himself, within the meaning of the fifth amendment to the Constitution, and is the equivalent of a search and seizure -- and an unreasonable search and seizure -- within the meaning of the fourth amendment," 116 U.S., at 634-35.

Since the rendition of the decision in *Boyd*, the Supreme Court has on some occasions limited the full import of that historic ruling. In *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538 (1911), the Court held that the *Boyd* principle did not apply to corporations; see also *United States v. Peter*, 479 F.2d 147 (6th Cir. 1973); and *In Re Grand Jury Empanelled March 8, 1983*, 722 F.2d 294 (6th Cir. 1983). Still later, application of *Boyd* to partnership records was prohibited in *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179 (1974). However until 1984, it still appeared that personal, non-corporate tax records of a person with potential criminal liability were still protected by *Boyd* principles. When the Supreme Court held that *Boyd* protection did not apply to partnership records in *Bellis*, supra, it expressly affirmed this proposition by stating as follows:

"The privilege applies to the business records of the sole proprietor or sole practitioner as well as to personal documents containing more intimate information about the individual's private life," 417 U.S., at 87- 88.

Likewise, *Fisher*, supra, did not emasculate *Boyd* in any respect as the issue in that case was completely different; in fact, the Court in *Fisher* definitely appeared to have sided with *Boyd* in the last paragraph of its opinion, when it stated as follows:

"Whether the Fifth Amendment would shield the taxpayer from producing his own tax records in his possession is a question not involved here; for the papers demanded here are not his 'private papers,' see *Boyd v. United States*," 425 U.S., at 414.

Shortly after its decision in *Fisher*, the Court was confronted with a similar issue in *Andresen v. Maryland*, 427 U.S. 463, 96 S.Ct. 2737 (1976). In *Andresen*, a search warrant had been issued for the seizure of certain private books and records, and the criminal defendant was not required to produce those records or authenticate them as authentication was achieved by the use of third parties. The

principles of *Boyd* and the crucial government-citizen relationship which it
protects. In the First Circuit case of *In Re Grand Jury Proceedings (Martinez)*,
626 F.2d 1051, 1056 (1st Cir. 1980), the Court found that "personal, self-created
business records in the possession of a sole proprietor or practitioner would enjoy a
privilege against subpoena." In the Second Circuit, the case of *United States v.
O'Henry's Film Works, Inc.*, 598 F.2d 313 (2nd Cir. 1979), held that a corporate
official's Fifth Amendment plea to questions concerning the location of corporate
records was valid; see also *United States v. Beattie*, 522 F.2d 267 (2nd Cir. 1975),
*United States v. Patterson*, 219 F.2d 659 (2nd Cir. 1955), *In Re Grand Jury
Subpoena Duces Tecum*, 657 F.2d 5 (2nd Cir. 1981), *In Re Grand Jury Witness
(Gilboe)*, 699 F.2d 71 (2nd Cir. 1983), and *United States v. Bobart Travel Agency,
Inc.*, 699 F.2d 618 (2nd Cir. 1983). The three cases of *In Re Grand Jury
Empanelled March 19, 1980*, 680 F.2d 327 (3rd Cir. 1982), *In Re Grand Jury
Proceedings (Johanson)*, 632 F.2d 1033 (3rd Cir. 1980), and *In Re Grand Jury
(Colucci)*, 597 F.2d 851 (3rd Cir. 1979), demonstrated that the Third Circuit
protects from production private books and records. In *United States v. Henry*,
491 F.2d 702 (6th Cir. 1974), the Sixth Circuit quashed an I.R.S. summons to a
taxpayer already indicted on a narcotics offense. The Seventh Circuit, faced with a
pro se litigant in *United States v. Awerkamp*, 497 F.2d 832 (7th Cir. 1974), who
was prematurely raising Fifth Amendment objections to the enforcement of an
I.R.S. summons, held that the taxpayer could make specific Fifth Amendment pleas
to questions directed at him when he complied with the order of enforcement.

In two other Seventh Circuit cases, *Hill v. Philpott*, 445 F.2d 144 (7th Cir.
1971), and *United States v. Dickerson*, 413 F.2d 1111 (7th Cir. 1969), that Court
held that the records of an individual taxpayer were immune from a summons.
The Eighth Circuit, in *Isaacs v. United States*, 256 F.2d 654 (8th Cir. 1958), held a
Fifth Amendment plea of a corporate official, in response to questions relating to
$99,000.00 in checks written by the corporation, to be valid. Another Eighth
Circuit opinion in *United States v. Plesons*, 560 F.2d 890 (8th Cir. 1977), would
have granted protection to the records of a doctor if he had raised his Fifth
Amendment plea to a grand jury subpoena before testifying concerning such
records. In the Ninth Circuit, in the case of *United States v. Helina*, 549 F.2d 713
(9th Cir. 1977), protection of a taxpayer's records from production was upheld.
The Ninth Circuit also has directly addressed the issue of protection of taxpayer
records in *United States v. Cohen*, 388 F.2d 464 (9th Cir. 1967), and has protected
the same from compelled production. The above cases demonstrate that the great
weight of authority in the various Circuits is that an individual taxpayer's records
are protected from compulsory production because of the Fifth Amendment.

The Fifth and Eleventh Circuits have apparently treated this precise issue
more often than the others and have conclusively held that tax records of an
individual are immune from production on the basis of *Boyd*. In the cases of

*Stuart v. United States*, 416 F.2d 459 (5th Cir. 1969), *In Re Grand Jury Proceedings (McCoy)*, 601 F.2d 162 (5th Cir. 1979), *In Re Oswalt*, 607 F.2d 645 (5th Cir. 1979), *In Re Grand Jury Subpoena (Kent)*, 646 F.2d 963 (5th Cir. 1981), and *United States v. Meeks*, 642 F.2d 733 (5th Cir. 1981), this principle was upheld. More specifically to the precise issue as the case at bar is *United States v. Davis*, 636 F.2d 1028, 1043 (5th Cir. 1981), wherein that Court held as follows:

> "Their cumulative teaching is that any incriminating papers in the actual or constructive possession of an individual, which he holds in his individual capacity, ... and which he himself wrote or which were written under his immediate supervision, are absolutely protected by the *Boyd* principle from production by subpoena or equivalent process, regardless of whether they are business-related or more inherently personal in content."

The Sixth Circuit does not deviate in any respect from comparable decisions made in other Circuits. In *Patty v. Bordenkircher*, 603 F.2d 587 (6th Cir. 1979), the Court held that the government couldn't compel a criminal defendant to testify concerning his previous criminal convictions where the same was relevant to a habitual offender statute. In *United States v. Hill*, 601 F.2d 253 (6th Cir. 1979), that Court acknowledged that a "taxpayer" could raise issues by refusing to answer specific questions. In *United States v. Doss*, 563 F.2d 265, 275 (6th Cir. 1977), in a case involving an indicted defendant called before a grand jury, that Court stated as follows:

> "However, upon the trial of the defendant in a criminal case, it would be a clear violation of a defendant's right against self-incrimination under the Fifth Amendment of the Constitution to compel him to take the stand, testify and produce his records, relating to the matter with which he is charged."

In *United States v. Schlansky*, 709 F.2d 1079, 1084 (6th Cir. 1983), a case wherein the taxpayer under investigation was compelled to surrender certain of his records which had previously been in his accountant's possession, the Sixth Circuit stated that the three elements of compulsion, testimonial communication and incrimination by such communication, were requisites to a valid assertion of the Fifth Amendment. In so holding, that Court stated as follows:

> "Under this focus the key question is whether the compelled production involves compelled testimonial communication. The answer to this question in turn depends on whether the very act of production supplies a necessary link in the evidentiary chain. Does it confirm that which was previously unknown to the government; e.g., the existence or location of the materials? Does it supply assurance of authenticity not available to the government from sources other than the person summonsed? Though the

Supreme Court in *Andresen* did not emasculate *Boyd* in any way and in fact
expressly affirmed *Boyd* by stating as follows:

> "Thus, although the Fifth Amendment may protect an individual from
> complying with a subpoena for the production of his personal records in his
> possession because the very act of production may constitute a compulsory
> authentication of incriminating information ..., a seizure of the same
> materials by law enforcement officers differs in a crucial respect – the
> individual against whom the search is directed is not required to aid in the
> discovery, production or authentication of incriminating evidence," 427
> U.S., at 473-74.

The Fifth Amendment to the U.S. Constitution states that no person shall be
compelled to be a "witness" against himself in a criminal prosecution. Similar
provisions exist in the constitutions of the various states of our nation, with some
such constitutional provisions following the Fifth Amendment via use of the word
"witness" while other provisions offer more expansive protection by stating that no
person shall be compelled to give "evidence" against himself in a criminal
prosecution. There exist distinct and crucial differences in the type of protection
offered under these two different types of constitutional provisions. The protection
against being compelled to give "evidence" against the accused is far broader than
protection only afforded to "witnessing" and giving "evidence" arguably would
include providing to the prosecution documents incriminating to the accused. The
protection afforded by the Fifth Amendment is only that of proscribing testimonial
compulsion and is not as all encompassing as the provisions prohibiting
compulsory production of "evidence."

Neither *Fisher* nor *Andresen* disturbed the holding in *Boyd* or *Bellis* and
both are wholly consistent with these two other cases. What the Supreme Court has
seen fit to do is note the crucial difference between protecting "evidence" and
being a compelled "witness"; private papers may no longer be specially protected
and in a distinct and different class from other evidence, property or contraband.
What the Supreme Court has directed is that an accused cannot be compelled to
produce his own incriminating books and records because such would involve to a
degree an amount of authentication of such books and records on the part of the
accused; such is tantamount to compelled testimony specifically proscribed by the
Fifth Amendment. What the Supreme Court has commanded is that if the
government desires to obtain personal books and records and use the same against
the accused, it must be done through witnesses other than the accused himself.
Prior to 1984, the last known pronouncement by the Supreme Court concerning
*Boyd* was its decision in *Bellis*, and that opinion expressly affirmed *Boyd*.

A survey of pre-1984 decisions reveals the continued vitality of the

party seeking to avoid compliance does not have to show more than is required to demonstrate that the privilege is properly claimed, he must make some showing that the act of production alone would involve an incriminating testimonial communication."

The Third Circuit case of *In Re Grand Jury Empanelled March 19, 1980,* 680 F.2d 327 (3rd Cir. 1982), involved the issue of compulsory production of books and records and that Court continued to uphold the principles of *Boyd.* Because of its defeat on this issue, the government sought and obtained a writ of certiorari with the United States Supreme Court, which granted the writ. On February 28, 1984, the U.S. Supreme Court reversed the above decision in *United States v. Doe,* 465 U.S. 605, 104 S.Ct. 1237, 1242 (1984). In this most recent pronouncement from that Court, it reversed its former holding in *Boyd* and held that books and records were no longer protected by the Fifth Amendment. It reasoned that the Fifth Amendment protected only compelled testimony and not books and records; it relied heavily upon its rationale in *Fisher,* supra. But, while the Court decided to withdraw Fifth Amendment protection to books and records, it held that production of such books and records was entitled to such protection. Compulsory production of books and records via subpoena or summons contains communicative, testimonial aspects, reasoned the Court, and these testimonial communicative aspects are entitled to Fifth Amendment protection. The Court quoted *Fisher* as follows:

"Compliance with the subpoena tacitly concedes the existence of the papers by the taxpayer. It also would indicate the taxpayer's belief that the papers are those described in the subpoena."

Thus in *Doe,* the U.S. Supreme Court has held that the act of producing books and records is entitled to Fifth Amendment protection.

The U.S. Supreme Court, in *Boyd v. United States,* supra, clearly held that compulsory production via subpoena or summons of books, records and other documents in the possession of a witness was not permitted by the Fifth Amendment. This holding, lasting some 98 years, effectively prevented the government from obtaining such written documentation from one having potential criminal liability. In *United States v. Doe,* supra, the Court made a change in emphasis on the construction of the Fifth Amendment and held that the Amendment did not protect such records; and by making this change, a problem not addressed by *Boyd* arose. If the records are not protected from compulsory production by the amendment, what protection by the Fifth Amendment is left to a witness under process to produce documents? In *Doe,* the Court analyzed this situation and found that the mere act of producing such documents via compulsion in effect, non-verbally, provided the following:

*Argomaniz*, 925 F.2d 1349 (11th Cir. 1991). Finally, in *In Re Grand Jury Proceedings on Feb. 4, 1982*, 759 F.2d 1418 (9th Cir. 1985), it was determined that records of a party under investigation in the hand's of his attorney were entitled to the *Doe* "act of production" rule. Thus, according to the rationale of these cases, the compulsory production of private personal records cannot be obtained in view of a valid Fifth Amendment objection. Therefore, it is clear that the decision in *Boyd* still produces a legal result, even if from its "grave."

## CONCLUSION

A summons or subpoena for individual books and records, either personal or business, can't be enforced over a Fifth Amendment objection because of the *Doe* "act of production" rule.

## THE CIVIL PROCEEDING

The rule that a party or a witness can plead the right against self-incrimination in civil proceedings has been well established by an abundance of authority. In *Lefkowitz v. Turley*, 414 U.S. 70, 77, 94 S.Ct. 316 (1973), the U.S. Supreme Court stated the rule as follows:

> "The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future proceedings."

The subsequent decisions of *Maness v. Meyers*, 419 U.S. 449, 95 S.Ct. 584 (1975), and *Pillsbury Company v. Conboy*, 459 U.S. 248, 103 S.Ct. 608 (1983), serve only to buttress this basic principle and apply it to specific situations. This rule is followed by the federal appellate courts; see *In re Kave*, 760 F.2d 343 (1st Cir. 1985); *National Life Ins. Co. v. Hartford Accident & Indemnity Co.*, 615 F.2d 595 (3rd Cir. 1980); *Wehling v. Columbia Broadcasting System*, 608 F.2d 1084 (5th Cir. 1979); *In Re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086 (5th Cir. 1980); *In re Morganroth*, 718 F.2d 161 (6th Cir. 1983); and *United States v. Jones*, 703 F.2d 473 (10th Cir. 1983).

Decisions on this point by various state courts reveal that this rule is not a modern one. In *Morris v. McClellan*, 154 Ala. 639, 45 So. 641, 645 (1908), that Alabama court acknowledged that a party in a civil case could claim the right against self-incrimination. In *International Brotherhood of Teamsters v. Hatas*, 287 Ala. 344, 252 So.2d 7, 21 (1971), the Court stated this principle as follows:

(a) Such production concedes that the requested documentation exists;

(b) Such production proves that the same are in the witness' possession;

(c) Such production proves that the witness believes that the documents so produced are those which are sought;

(d) The act of production authenticates the documents.

Because of these non-verbal but communicative aspects present within any act of production, the Court held that the Fifth Amendment applied to the act of production. Thus, even though there is no longer any protection afforded by the Fifth Amendment for books and records, the Fifth Amendment's protection for the act of production accomplishes virtually the same result as under the *Boyd* doctrine.

This has proven to be the case as shown by various cases decided subsequent to *Doe*. In *In re Kave*, 760 F.2d 343, 355-56 (1st Cir. 1985), an attorney was permitted to plead the protection of the Fifth Amendment because the request to produce certain documentary evidence would have in effect, under the "act of production" rule, forced her to testify against herself. In so holding, the Court held:

> "The compelled production of such documents is prohibited only if there are testimonial aspects to the act of production itself. ... This rule extends to the business records of a sole proprietor ... In this context, the rule has three elements: The Fifth Amendment protects against compulsory surrender of (1) personal business records, (2) in the possession of a sole proprietor or practitioner, (3) only with respect to the testimonial act implicit in the surrender itself."

In *In Re Grand Jury Matter*, 768 F.2d 525 (3rd Cir. 1985), the issue concerned the compulsory production of corporate records. While in the past such records have not been immune from production, here the Court held that the "act of production" rule applied and thus prevented the witness from being compelled to authenticate the corporate records by such production. In *United States v. (Under Seal)*, 745 F.2d 834 (4th Cir. 1984), a case decided some seven (7) months after *Doe*, the Fourth Circuit specifically held that personal and individual records can't be forcibly produced by any process, over a Fifth Amendment objection; see also *United States v. Cates*, 686 F.Supp. 1185 (D.Md. 1988). The *Doe* "act of production" rule was followed in *In Re Grand Jury Proceedings*, 747 F.2d 1098 (6th Cir. 1984), to prevent the compulsory production of corporate and partnership records. In *United States v. G & G Advertising Company*, 762 F.2d 632 (8th Cir. 1985), that Court held that corporate records could be compelled from a witness by means of a summons, but personal records could not; see also *United States v.*

"The privilege against self-incrimination afforded by section 6 of the 1901 Constitution of Alabama has been held available to a party in a civil action."

Similar decisions have been made by courts in other States in the Union. In *State ex rel. Hudson v. Webber*, 600 S.W.2d 691, 692 (Mo. App. 1980), a judgment debtor pleaded his right against self-incrimination in answer to questions posed to him regarding his financial affairs, his fear of incrimination being related to federal taxes. The court sanctioned the answers of this party stating as follows:

"This privilege is available to a judgment debtor in proceedings pursuant to sections 513.380-513.390, RSMO 1978."

The great weight of other State authorities holds that the right clearly applies in civil cases; see *Carson v. Jackson*, 466 So.2d 1188 (Fla.App. 1985); *Lewis v. First American Bank of Palm Beach*, 405 So.2d 300 (Fla.App. 1981); *Travis Meat & Seafood Co. v. Ashworth*, 127 Ga. App. 284, 193 S.E.2d 166 (1972); *In re Zisook*, 88 Ill.2d 321, 430 N.E.2d 1037 (1982); *Martincich v. City of Hammond*, 419 N.E.2d 240 (Ind. App. 1981); *Whippany Paper Board Co. v. Alfano*, 176 N.J.S. 363, 423 A.2d 648 (1980); *Banca v. Town of Phillipsburg*, 181 N.J.S. 109, 436 A.2d 944 (1981); *People ex rel. Anonymous v. Saribeyoglu*, 131 Misc. 2d 647, 501 N.Y.S.2d 286 (1986); *Byrd v. Hodges*, 44 N.C.App. 509, 261 S.E.2d 269 (1980); *Ohio Civil Rights Commission v. Parklawn Manor, Inc.*, 41 Ohio St.2d 47, 322 N.E.2d 642 (1975); *Rey v. Means*, 575 P.2d 116 (Okl. 1978); *Caloric Corp. v. Unemployment Compensation Board of Review*, 452 A.2d 907 (Pa. Comwlth. 1982); *Ex Parte Stringer*, 546 S.W.2d 837 (Tex.App. 1985); *Smith v. White*, 695 S.W.2d 295 (Tex.App. 1985); *Affleck v. Third Judicial District Court of Salt Lake County*, 655 P.2d 665 (Utah 1982); *Eastham v. Arndt*, 28 Wash. App. 524, 624 P.2d 1159 (1981); and *In re Grant*, 83 Wis.2d 77, 264 N.W.2d 587 (1978).

Respectfully submitted this 23ʳᵈ day of February, 2008.

UNITED STATES

INTERNAL REVENUE SERVICE


In the Matter of:          )
                           )
BETTY J. EBY-ROSE          )




SUMMONS APPOINTMENT



Monday,
February 11, 2008



Federal Building
777 Sonoma Avenue
Santa Rosa, California






        The above-entitled matter came on for appointment,

pursuant to notice, at 11:30 o'clock a.m.

**APPEARANCES:**

TERESA RYAN, Revenue Officer

KAREN CASEY, Revenue Officer

BETTY J. EBY-ROSE

RICHARD ROSE

3

1          P R O C E E D I N G S

2                                          (11:30 o'clock a.m.)

3          MS. RYAN:  Monday, February 11th, Summons

4     Appointment for taxpayer Betty Eby, and my name is Teresa

5     Ryan, Revenue Officer, Badge No. 68-11529, and my manager,

6     Karen Casey.  And also I'd like the others to introduce

7     themselves, please.

8          MS. EBY-ROSE:  I'm Betty Eby.

9          MR. ROSE:  Richard Rose.

10          MS. RYAN:  And your relationship?  Husband.

11          Excuse me, sir.  Can you introduce yourself,

12     please?

13          THE REPORTER:  I'm William Ryherd, the court

14     reporter.

15          MS. RYAN:  Okay.  So the purpose of the appointment

16     today is the summons for documents and records concerning tax

17     years 2000, 2001, 2002, 2003, and 2004.

18          MS. CASEY:  Let's set the parameters down.

19          MS. RYAN:  Okay.

20          MS. CASEY:  You have said you wanted to go out and

21     talk to your advisor or leave the room, for whatever purpose.

22     We're not going to be able to do that after every question,

23     in that we have to do this in a reasonable way and a

24     reasonable time.  So we'll go about 20 minutes.  You can make

25     whatever notes you want, go talk to him for about five

4

1    minutes, and then come back.

2           MS. RYAN:  All right.  So let's get started.

3           So the first record that is requested here is a

4    statement of wages, and we'll go through this for the years

5    2000, 2001, '2, '3, and '4.

6           So for -- well, first of all, do you have records

7    that you'd like to produce per year or what did you bring in

8    today?

9           MS. EBY-ROSE:  I brought in a bunch of records.  I

10   have numbered each page.

11          MS. RYAN:  Okay.  Well, let's get started by year,

12   then.  What do you have for 2000?

13          MS. EBY-ROSE:  Before I answer that question, can

14   those records be used against me in a criminal case?

15          MS. CASEY:  Well, I suppose they probably could,

16   but we're not dealing with a criminal case.  This is not a

17   criminal --

18          MS. EBY-ROSE:  Could they be used against me in a

19   court of law?

20          MS. CASEY:  You know, Mrs. Eby, this is something

21   that you're well aware of and that every taxpayer provides

22   those records.

23          MS. EBY-ROSE:  Would you please write that down for

24   me, that these will not be used against me in a court of law

25   and sign it?

5

1          MS. CASEY:  Well, no, because if we don't get the

2     records we need, we'll be talking to a Judge in a court of

3     law.

4          And that would be wise, because you didn't produce

5     them, not because you did.

6          MS. EBY-ROSE:  I am going to have to take the Fifth

7     Amendment on that question, on that particular question.  You

8     didn't answer my question.

9          MS. RYAN:  So for 2000, providing records related

10    to income, you're taking the Fifth Amendment, is that

11    correct?

12          MS. EBY-ROSE:  Just that year, yes.

13          MS. RYAN:  All right.  So I have a follow-up

14    question to that.  When you were with the -- to appear before

15    the Judge last time, and/or the District U.S. Attorney Tom

16    Moore, there was a discussion with him regarding two parties

17    that were paying you rent for the time periods involved,

18    regarding May Zinder and Barbara Richardson, at $3,600 per

19    month.  That's our bank records.  Actually, the testimony to

20    Mr. Moore -- the conversation with Mr. Moore was $3,000 per

21    month.

22          So for the period of 2000, was May Zinder in your

23    care or staying in your home or providing any income to you?

24          MS. EBY-ROSE:  I take the Fifth Amendment on that.

25          MS. RYAN:  And this is information you've

1    already provided to Mr. Moore.  So you're taking the Fifth
2    Amendment --

3          MS. EBY-ROSE:  Let me say for the record that's why
4    I have counsel with me and I -- I'm very aware that I have a
5    right to have someone with me.  And I was so drowsy and my
6    sister had just recently died -- and he knew it -- and he
7    brow-beat me out in that hallway and brow-beat me and I don't
8    want to go through that again.  I won't go through that
9    again.  I will stand before a Judge before I do that again.

10         MS. RYAN:  Okay.  I'm going to move on to the next
11   question, then, regarding Barbara Richardson.  Did you have
12   income from Barbara Richardson during the period of 2000?

13         MS. EBY-ROSE:  I take the Fifth.

14         MS. RYAN:  So for 2000, you're not going to be
15   writing any statement of wages, statements regarding interest
16   or dividend income, employee earning statements for the year,
17   records of deposits to bank accounts, any and all of the
18   above records, documents, receipts, regarding wages,
19   salaries, tips, fees, commissions and any other compensation
20   for services, or any other income regarding gains from
21   dealings on property, interest, rental, ground fee, and
22   dividend income, alimony, annuities, income life insurance
23   policies and endowment contracts, pensions, income from the
24   discharge of investment, distributed shares of partnership
25   income, or income from an estate or a trust?

7

1    MS. EBY-ROSE:  I didn't say that.  It depends on

2   the question.

3    MS. RYAN:  Oh, well, I asked you all of those

4   questions.  So I'll go one-on-one.

5    Statement of wages for 2000, are you going to

6   provide any information regarding statement of wages?

7    MS. EBY-ROSE:  I take the Fifth.

8    MS. CASEY:  One thing, you did say that we did not

9   answer your question.  We are not criminal employees, part of

10   the criminal division.  We are civil employees, revenue

11   officers.  We are asking this as civil revenue officers.  We

12   really can't give you information on the criminal cases.

13    MS. EBY-ROSE:  I just spoke -- I think that's what

14   I said, but I wanted to make it clear.

15    MS. RYAN:  Okay.  For 2000, are you providing any

16   statements regarding interest or dividend income?

17    MS. EBY-ROSE:  I take the Fifth.

18    MS. RYAN:  For 2000, are you going to provide any

19   information regarding employee earnings' statements for 2000?

20    MS. EBY-ROSE:  I take the Fifth.

21    MS. RYAN:  Okay.  For 2000, are you going to

22   provide any records of deposits to bank accounts?

23    MS. EBY-ROSE:  I take the Fifth.

24    MS. RYAN:  Okay.  For 2000, are you going to

25   provide any information regarding books, records, documents,

1    receipts regarding wages, salaries, tips, fees, commissions,

2    or any other compensation for services?

3              MR. ROSE:  She asked you that question earlier.

4              MS. EBY-ROSE:  I take the Fifth.

5              MS. RYAN:  Okay.  And the next question is

6    regarding gains from dealings on property, interest, rental,

7    royalty, dividend income -- we already covered -- alimony,

8    annuities, income from life insurance policies or endowment

9    contracts, pensions, income from the discharge of

10   indebtedness, distributed shares of partnership income, or

11   income from and estate or a trust?

12             MS. EBY-ROSE:  I take the Fifth.

13             MS. RYAN:  That's 2000.  So you're taking the Fifth

14   on all of the questions regarding 2000.  We'll move on to

15   2001.

16             And, again, regarding 2001, I'm going to ask you

17   some questions about May Zinder, Barbara Richardson, or any

18   other parties who may have provided you with income during

19   that time frame.  Did you have any income from Barbara

20   Richardson or May Zinder?

21             MS. EBY-ROSE:  I take the Fifth.

22             MS. RYAN:  Okay.  So regarding 2001, did you

23   provide anything today regarding statement of wages?

24             MS. EBY-ROSE:  I take the Fifth.

25             MS. RYAN:  Regarding 2001, did you bring any

1  information regarding statements of interest or dividend

2  income?

3         MS. EBY-ROSE:  I take the Fifth.

4         MS. RYAN:  Regarding 2001, did you bring any

5  information regarding employee earnings statements for the

6  years?

7         MS. EBY-ROSE:  I take the Fifth.

8         MS. RYAN:  Regarding 2001, did you bring any

9  records of deposits to bank accounts?

10         MS. EBY-ROSE:  I take the Fifth.

11         MS. RYAN:  Regarding 2001, did you bring any

12  information regarding any other books, records, documents,

13  receipts regarding wages, salaries, tips, fees, commissions,

14  or any other compensation for services?

15         MS. EBY-ROSE:  I take the Fifth.

16         MS. RYAN:  Okay.  And then did you bring any

17  information today regarding dealings on property, interest,

18  rent, royalty, alimony, annuities, income, life insurance

19  policies, endowment contracts, pensions, income from the

20  discharge of indebtedness, distributed shares of partnership

21  income or income from an estate or trust?

22         MS. EBY-ROSE:  I take the Fifth.

23         MS. RYAN:  Okay.  We'll move on to 2002.  So for

24  2002, did you have any income from May Zinder or Barbara

25  Richardson?

1       MS. EBY-ROSE:  I take the Fifth.

2       MS. RYAN:  Okay.  So regarding 2002, did you bring

3    any documents today regarding a statement of wages?

4       MS. EBY-ROSE:  I take the Fifth.

5       MS. RYAN:  Regarding 2002, did you bring any

6    statements regarding interest or dividend income?

7       MS. EBY-ROSE:  I take the Fifth.

8       MS. RYAN:  Regarding 2002, did you bring any

9    employee earnings' statements for the years?

10      MS. EBY-ROSE:  I take the Fifth.

11      MS. RYAN:  Regarding 2002, did you bring any

12   records of deposits to bank accounts?

13      MS. EBY-ROSE:  I take the Fifth.

14      MS. RYAN:  Regarding 2002, did you bring any and

15   all books, records, documents, receipts regarding wages,

16   salaries, tips, fees, commissions, or any other compensation

17   for services?

18      MS. EBY-ROSE:  I take the Fifth.

19      MS. RYAN:  Okay.  Regarding 2002, did you have any

20   gains from dealings on property, interest, rental, royalty,

21   alimony, annuities, income, life insurance policies,

22   endowment contracts, pensions, income from the discharge of

23   indebtedness, distributed shares of partnership income or

24   income from an estate or trust?

25      MS. EBY-ROSE:  I take the Fifth.

1    MS. RYAN:  We'll move on to 2003.  For the period

2    of 2003, did you have any income from Barbara Richardson or

3    May Zinder?

4         MS. EBY-ROSE:  I take the Fifth.

5         MS. RYAN:  And regarding 2003, did you bring any

6    documentation regarding statement of wages?

7         MS. EBY-ROSE:  I take the Fifth.

8         MS. RYAN:  Regarding 2003, did you bring any

9    information regarding statements of interest or dividend

10   income?

11        MS. EBY-ROSE:  I take the Fifth.

12        MS. RYAN:  Regarding 2003, did you bring any

13   information regarding employee earnings' statements for the

14   years?

15        MS. EBY-ROSE:  I take the Fifth.

16        MS. RYAN:  Regarding 2003, did you bring any

17   records of deposits to bank accounts?

18        MS. EBY-ROSE:  I take the Fifth.

19        MS. RYAN:  Regarding 2003, did you bring any

20   information or any and all books, records, documents and

21   receipts regarding wages, salaries, tips, fees, commissions,

22   or any other compensation for services?

23        MS. EBY-ROSE:  I take the Fifth.

24        MS. RYAN:  Regarding 2003, did you bring any

25   information regarding gains from dealings on property,

```
 1      interest, rental, royalty, alimony, annuities, income, life

 2      insurance policies, endowment contracts, pensions, income

 3      from the discharge of indebtedness, distributed shares of

 4      partnership income or income from an estate or trust?

 5                   MS. EBY-ROSE:  I take the Fifth.

 6                   MS. RYAN:  So we'll be moving on to 2004.

 7                   For 2004, did you have any income from May Zinder

 8      or Barbara Richardson?

 9                   MS. EBY-ROSE:  I take the Fifth.

10                   MS. RYAN:  So regarding 2004, do you have any

11      documents today regarding statement of wages?

12                   MS. EBY-ROSE:  I take the Fifth.

13                   MS. RYAN:  Regarding 2004, did you have any

14      statements of record regarding interest or dividend income?

15                   MS. EBY-ROSE:  I take the Fifth.

16                   MS. RYAN:  Regarding 2004, did you bring any

17      information regarding employee earnings' statements for the

18      years?

19                   MS. EBY-ROSE:  I take the Fifth.

20                   MS. RYAN:  Regarding 2004, did you bring any

21      records of deposits to bank accounts?

22                   MS. EBY-ROSE:  I take the Fifth.

23                   MS. RYAN:  Regarding 2004, did you bring any

24      information or any and all books, records, documents and

25      receipts regarding wages, salaries, tips, fees, commissions,
```

1    or any other compensation for services?

2         MS. EBY-ROSE:  I take the Fifth.

3         MS. RYAN:  Regarding 2004, did you bring any

4    information regarding gains from dealings on property,

5    interest, rental, royalty, dividend income, alimony,

6    annuities, income from life insurance policies, endowment

7    contracts, pensions, income from the discharge of

8    indebtedness, distributed shares of partnership income or

9    income from an estate or trust?

10        MS. EBY-ROSE:  I take the Fifth.

11        MS. RYAN:  Moving to additional questions:  And

12   what about during these years -- 2000, 2001, 2002, 2003 and

13   2004 -- was any income received from Catherine Spencer?

14        MS. EBY-ROSE:  I take the Fifth.

15        MS. RYAN:  Regarding 2001 (sic), 2001, 2002, 2003,

16   2004, was any income received from Tomeneal Morgan?

17        MS. EBY-ROSE:  I take the Fifth.

18        MS. RYAN:  And during this time from 2000 to 2004,

19   did you secure a reverse mortgage and receive any income

20   regarding that?

21        MS. EBY-ROSE:  I take the Fifth.

22        MS. RYAN:  Okay.  So per our conversation, you're

23   not providing any of the information requested in the

24   summons, is that correct?

25        MS. EBY-ROSE:  That's correct.  I'd like to take

1    the Fifth Amendment.  That's part of our Constitution.

2              MS. RYAN:  Okay.  I think that concludes the

3    summons appointment today.  Nothing further to discuss.

4              MS. CASEY:  We will be informing the U.S. Attorney

5    that you have not complied with the summons and he will take

6    whatever action that's necessary.

7              MS. EBY-ROSE:  I certainly will do that.

8              MS. CASEY:  No, I said we will advise him.

9              (Whereupon, the proceedings concluded at 11:53.)

10                         ---o0o---

1       REPORTER'S CERTIFICATE

2    TITLE:   BETTY J. EBY-ROSE

3    DATE:   FEBRUARY 11, 2008

4    LOCATION:   SANTA ROSA, CALIFORNIA

5

6

7

8            This is to certify that the attached proceedings

9    were held according to the record and that this is the

10   original, complete, true and accurate transcript which has

11   been compared to the reporting or recording accomplished at

12   the proceedings.

13

14

15                                        2 | 19 | 08

16   SIGNATURE OF REPORTER                           DATE

17

18

19

20

21

22

23

24

25